UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

**RICHARD DODD,**

   **Plaintiff,**

    **v.**           **CAUSE NO. 3:19CV299-PPS**

**WEXFORD MEDICAL INC., et al.,**

   **Defendants.**

OPINION AND ORDER

   Richard Dodd, a prisoner without a lawyer, is proceeding in this case on several claims against Wexford Medical, which provides healthcare services to prisoners at the Westville, Indiana Correctional Facility, and a number of Wexford's healthcare providers. ECF 62. The defendants jointly seek summary judgment on all claims. ECF 97. Because there are no genuine issues of material fact and it is clear that Defendants are entitled to judgment as a matter of law, the motion will be granted.

   Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th

Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must satisfy both objective and subjective components by showing: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To be held liable for deliberate indifference to an inmate's medical needs, a medical professional must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). "Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Where the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does

not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Dodd is proceeding on seven claims against five defendants. Each defendant will be addressed in turn.

1. **Claims Against Dr. James Jackson**

Dodd claims that Dr. Jackson was deliberately indifferent to his pain associated with ankylosing spondylitis and iritis. Ankylosing spondylitis is an inflammatory disease that, over time, can cause some of the bones in the spine to fuse. https://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/symptoms-causes/syc-20354808#:~:text=Ankylosing%20spondylitis%20is%20an%20inflammatory, be%20difficult%20to%20breathe%20deeply..  Iritis is a swelling and irritation in and around the eye. https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/uveitis (last visited August 15, 2022).

*Pain associated with his ankylosing spondylitis*

Dodd testified at his deposition that Dr. Jackson acted with deliberate indifference to his pain associated with ankylosing spondylitis because Dr. Jackson discontinued his prescription for Naproxen, an anti-inflammatory pain medication. ECF 98-6 at 8. Dr. Jackson argues he was not deliberately indifferent because he had a strong medical justification for discontinuing Dodd's Naproxen prescription and replacing it with an alternative pain medication. ECF 98 at 26-27.

Dr. Jackson provides his affidavit, an affidavit from Dr. Liaw, and Dodd's medical records, which show the following: During all relevant times, Dr. Jackson was

employed by Wexford as a physician at Westville Correctional Facility ("WCF"). ECF

98-3 at 1. Dodd arrived at WCF in August 2017 with a medical history positive for a

diagnosis of ankylosing spondylitis. *Id.* When he arrived at WCF, Dodd had an active

prescription for an injectable medication called Cimzia to diminish any inflammatory

response from his ankylosing spondylitis, along with a prescription for Naproxen to

deal with the related pain. *Id.* at 1-2; ECF 98-7 at 3. Upon his intake at WCF, Dodd was

enrolled in the facility's chronic care facility to regularly monitor his ankylosing

spondylitis, asthma, and gastroesophageal reflux disease ["GERD"]. ECF 98-3 at 1-2. He

was assigned to Dr. Jackson as his chronic care physician and was scheduled to see Dr.

Jackson every three months to discuss and treat his chronic conditions. *Id.* at 2.

Dr. Jackson first saw Dodd for a chronic care visit in September 2017. *Id.*; ECF 98-

7 at 1-3. During this visit, Dr. Jackson renewed Dodd's prescriptions for Cimzia and

Naproxen. *Id.* Dr. Jackson saw Dodd for additional chronic care visits in December 2017

and March 2018 and renewed his medications on both occasions. ECF 98-3 at 2; ECF 98-

7 at 5-7, 10-12.

On June 11, 2018, Dr. Jackson saw Dodd for a chronic care visit and discussed

with him possible substitutes for Naproxen, which was no longer a formulary

medication. ECF 98-3 at 3; ECF 98-7 at 13-15. Dr. Jackson offered Dodd Meloxicam, also

known as Mobic, as a substitute for Naproxen. *Id.* Naproxen and Mobic are both non-

steroidal anti-inflammatory drugs that limit pain by decreasing inflammation in the

joints. *Id.*; ECF 98-2 at 4. Mobic was considered a formulary medication, whereas

Naproxen was made a non-formulary medication when given chronically because of

4

risks associated with long term use, including damage to the stomach lining and gastrointestinal tract. ECF 98-3 at 4-5; ECF 98-2 at 5. Dr. Jackson did not believe Dodd required an ongoing chronic prescription for Naproxen in view of the risk it posed of damaging his stomach lining. ECF 98-3 at 4. Dodd agreed to try Mobic as an alternative to Naproxen. *Id.* at 3. Accordingly, Dr. Jackson continued Dodd's prescription for Cimzia injections, discontinued his Naproxen prescription, and prescribed him Mobic for pain relief. *Id*. Dodd was still able to purchase Naproxen from the commissary if he chose. *Id.* at 5.

On September 12, 2018, Dr. Jackson saw Dodd for a chronic care appointment and renewed his prescriptions for Mobic and Cimzia injections. *Id.* at 3; ECF 98-7 at 26-28. In November 2018, Dodd informed Dr. Jackson that Mobic was not effective at relieving his pain and requested he be re-prescribed Naproxen, but Dr. Jackson would not re-prescribe him Naproxen and instead ordered he receive Tylenol 650 mg twice per day as needed for pain. ECF 98-3 at 4; ECF 98-7 at 39-43. Because Dodd does not dispute these attestations or the contents of his medical records, I accept them as undisputed.

Here, it is undisputed that Dr. Jackson provided Dodd with treatment for his pain associated with his ankylosing spondylitis at all times, as he continuously provided him with Cimzia injections and prescribed him Mobic and Tylenol as alternatives to Naproxen. Thus, the question is whether Dr. Jackson's decision to discontinue Dodd's Naproxen prescription and prescribe him alternative pain medications was "plainly inappropriate." *See Hayes*, 546 F.3d at 524.

Dr. Jackson argues he had a strong medical justification for changing Dodd's medication from Naproxen to Mobic, as Dodd had a history of GERD and research shows Mobic has less severe side effects on a patient's stomach than Naproxen. ECF 98 at 26-27. In support of this argument, Dr. Jackson offers an attestation from Dr. Liaw that, in Dr. Liaw's medical opinion, Mobic is a safer medication for Dodd than Naproxen because (1) Dodd has a history of GERD and Mobic is easier on the gastrointestinal tract than Naproxen, and (2) there is less risk of interruption in Dodd's prescription because Mobic is a formulary medication. ECF 98-2 at 5. Thus, both Dr. Jackson and Dr. Liaw attest that Dr. Jackson's decision to change Dodd's medication from Naproxen to Mobic was a proper exercise of his medical judgment.

In his response, Dodd argues it was plainly inappropriate to change his medication from Naproxen to Mobic for two reasons. This is because, according to Dodd, a rheumatologist previously prescribed him Naproxen with instructions that the medication should not be substituted with an equivalent medication. ECF 113 at 3. In support of this argument, Dodd provides a medical record from December 2016, in which a physician prescribed him Enbrel and circled a box indicating an equivalent medication should not be substituted. ECF 115-1 at 11. But the fact that a physician indicated an equivalent medication should not be substituted for Enbrel in December 2016 does not show it was plainly inappropriate for Dr. Jackson to change Dodd's medication from Naproxen to Mobic in June 2018. Dodd also argues it was inappropriate to change his medication from Naproxen to Mobic because he had a "lifetime" prescription for Naproxen. ECF 113 at 3. Dodd supports this argument by

citing to his medication administration record from 2017, but this chart indicates his Naproxen prescription was scheduled to be discontinued in February 2018. ECF 115-1 at 2. Dodd provides no other argument or evidence that it was plainly inappropriate to change his medication from Naproxen to Mobic.

Thus, Dr. Jackson has provided evidence that the decision to change Dodd's medication from Naproxen to Mobic was a reasonable exercise of his professional medical judgment, and Dodd provides no evidence by which a reasonable jury could conclude Dr. Jackson's decision was plainly inappropriate. Summary judgment is therefore warranted in favor of Dr. Jackson on this claim.

*Pain Associated with Iritis*

Dodd testified at his deposition that Dr. Jackson was deliberately indifferent to his iritis because he did not care about his complaints of eye pain. ECF 98-6 at 8. Dr. Jackson argues he was not deliberately indifferent to Dodd's iritis because he was not significantly involved in treating this condition and he reasonably responded to Dodd's complaints of eye pain by ensuring he was receiving treatment and referring him to see an optometrist. ECF 98 at 27.

Dr. Jackson's affidavit and Dodd's medical records support the following facts: On September 5, 2018, Dodd had a nurse visit and complained of eye redness. ECF 98-7 at 18-23. A nurse contacted urgent care and Dodd received steroid eye drops that same day. *Id.* at 18, 23. The following week, Dr. Jackson saw Dodd for a chronic care appointment. ECF 98-3 at 3; ECF 98-7 at 26-28. Dodd did not report any eye problems at

this appointment, and Dr. Jackson believed Dodd's prior complaint of eye redness had resolved after he took his prescribed steroid eye drops. *Id.*

A couple weeks later, Dr. Jackson was contacted by a nurse after Dodd had a recurrence of eye redness and discomfort. ECF 98-3 at 3; ECF 98-7 at 33-35. The nurse informed Dr. Jackson that Dodd's eyes were not experiencing any drainage and that he had recently been prescribed steroid eye drops. ECF 98-3 at 3. Dr. Jackson instructed the nurse to schedule Dodd to be seen by Dr. Dennis Lewton, the on-site optometrist. *Id.*; ECF 98-7 at 35.

On October 4, 2018, a nurse contacted Dr. Liaw, not Dr. Jackson, regarding Dodd's continuing complaints of eye redness. ECF 98-7 at 36. The nurse reported to Dr. Liaw that the steroid eye drops Dodd had been receiving had decreased the eye redness but his symptoms had persisted. *Id.* Dr. Liaw assessed Dodd and gave him a steroid injection along with an order for oral steroids. *Id.* The next week, the on-site optometrist Dr. Lewton assessed Dodd, noted his visual acuity was normal, and made no changes to his treatment plan. ECF 98-3 at 4; ECF 98-7 at 37-38. Dodd's medical records do not indicate he had any further complaints regarding his eyes after his appointment with Dr. Lewton. Because Dodd does not dispute these attestations or the contents of his medical records, I accept them as undisputed.

Dodd argues that Dr. Jackson was deliberately indifferent for scheduling him to see the optometrist instead of providing him immediate treatment, which caused him to suffer damage to his eye. ECF 113 at 3. But Dodd provides no evidence by which a reasonable jury could conclude Dr. Jackson's response to his complaint of eye pain was

plainly inappropriate. Specifically, studies from the National Institute of Health indicate a primary care physician should treat a patient experiencing symptoms of iritis by referring him to see a specialist as soon as possible, and should treat the patient with steroids only after consulting with the specialist. *See* https://www.ncbi.nlm.nih.gov/books/NBK430909/#article-23764.s9 (last accessed August 15, 2022). There is no evidence Dr. Jackson delayed in scheduling Dodd to see Dr. Lewton. Moreover, the NIH states that "[p]rescription eye drops are the most common treatment for iritis." *See* https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/uveitis (last accessed August 15, 2022).

In sum, based on record evidence, no reasonable jury could conclude it was "plainly inappropriate" for Dr. Jackson to respond to Dodd's complaint of eye pain by ensuring he was receiving prescription eye drops and referring him to see a specialist as soon as possible. *Hayes*, 546 F.3d at 524. Thus, summary judgment is warranted in favor of Dr. Jackson on this claim.

## 2. **Claims Against Dr. Andrew Liaw**

Dodd is proceeding against Dr. Liaw "for deliberate indifference to his serious medical need for treatment for his pain associated with his ankylosing spondylitis[.]" ECF 62 at 11. At his deposition, Dodd testified he is suing Dr. Liaw for discontinuing his Naproxen prescription and prescribing him Mobic as a substitute. ECF 98-6 at 9. However, Dr. Liaw attests he was not responsible for the decision to change Dodd's prescription from Naproxen to Mobic, and Dodd provides no evidence disputing this attestation. *See* ECF 98-2 at 4-5; ECF 113 at 4-5. It is thus undisputed that Dr. Liaw did

not change Dodd's prescription from Naproxen to Mobic. In his response to the summary judgment motion, Dodd does not provide any other explanation for how Dr. Liaw was deliberately indifferent to his pain associated with his ankylosing spondylitis. ECF 113 at 4-5. He states Dr. Liaw reduced his dosage of Naproxen in March 2018, but he provides no evidence in support of this contention other than his own speculation. Specifically, the medical records indicate Dodd was consistently prescribed 500 mg of Naproxen twice per day, and Dodd does not explain why he believes Dr. Liaw lowered his dosage. *See* ECF 98-7 at 7-12; *Trade Fin. Partners, LLC*, 573 F.3d at 407; *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough") (quotation marks, brackets, and citation omitted).

What's more, even if there were evidence that Dr. Liaw reduced Dodd's Naproxen dosage, Dodd does not argue or provide any evidence that it was improper for him to do so. In other words, there is no evidence by which a reasonable jury could conclude Dr. Liaw was deliberately indifferent to Dodd's pain associated with his ankylosing spondylitis.[1]  Summary judgment is therefore warranted in favor of Dr. Liaw on this claim.

3. **Claims Against Nurse Dorothy Livers**

---

[1] Dodd also argues in his response to the summary judgment motion that Dr. Liaw was deliberately indifferent to his iritis, but he is not proceeding against Dr. Liaw in regard to his iritis. *See* ECF 62 at 11.

Dodd is also proceeding against Nurse Livers for deliberate indifference to his serious medical needs relating to the same two ailments: ankylosing spondylitis and iritis. Each condition will be addressed in turn.

Dodd testified at his deposition he is suing Nurse Livers for deliberate indifference to his pain associated with his ankylosing spondylitis because she would not provide him Naproxen. ECF 98-6 at 11. But Nurse Livers attests she is not a physician and had no authority to prescribe Dodd Naproxen or overrule Dr. Jackson's decision to change his Naproxen prescription. ECF 98-4 at 1-3. In his response to the summary judgment motion, Dodd argues Nurse Livers was deliberately indifferent for continuing to provide treatment she knew to be ineffective, but he does not dispute that Nurse Livers provided him with his prescribed medication and had no authority to change his prescriptions. ECF 113 at 5-6. Thus, no reasonable jury could conclude Nurse Livers was deliberately indifferent to Dodd's pain associated with his ankylosing spondylitis. Summary judgment is warranted in favor of Nurse Livers on this claim.

As for his claim related to his iritis, Dodd testified at his deposition he is suing Nurse Livers for deliberate indifference to his iritis because she improperly provided him with artificial tears during a nursing visit on September 18, 2018. ECF 98-6 at 10-11. Nurse Livers argues she provided reasonable treatment to Dodd during this nursing visit. ECF 98 at 29.

Nurse Livers provides an affidavit and Dodd's medical records, which show the following: During all relevant times, Nurse Livers was employed by Wexford as the Health Service Administrator at WCF. ECF 98-4 at 1. On September 18, 2018, Nurse

11

Livers saw Dodd after he had been brought to the medical unit by a custody officer. *Id.* at 2; ECF 98-7 at 29-30. Dodd had been complaining to custody staff that he had a red eye for a few days, and he thought his symptoms may have migrated to his other eye. *Id.* On examination, Dodd's eye appeared to be reddened and he was reporting some pain, but he denied any crusty drainage or itching. *Id.* Nurse Livers did not observe any signs of a significant abnormality and did not believe he had a bacterial infection, so she provided him with artificial tears and instructed him to submit another healthcare request if his eyes did not improve by the next week. *Id.* If Nurse Livers had observed a significant abnormality, she would have referred Dodd for an assessment from a medical provider. ECF 98-4 at 3. Dodd's returned to the medical unit two days later and received treatment from a different nurse. *Id.* at 2; ECF 98-7 at 31-32. The record contains no evidence of any other interactions between Nurse Livers and Dodd related to Dodd's iritis. Because Dodd does not dispute these attestations or the contents of his medical records, I accept them as undisputed.

For his part, Dodd testified at his deposition that it was improper for Nurse Livers to provide him artificial tears on September 18, 2018; but he offers no explanation or evidence in support of this contention. ECF 98-6 at 10-11. In his response to the summary judgment motion, Dodd argues only that Nurse Livers was deliberately indifferent for continuing to provide treatment she knew to be ineffective. ECF 113 at 5-6. But there is no evidence Nurse Livers knew or had reason to know that artificial tears would be ineffective at treating his symptoms. Thus, Dodd provides no evidence by which a reasonable jury could conclude it was plainly inappropriate for Nurse Livers to

12

provide him artificial tears. And because there is no evidence Nurse Livers had any other interaction with Dodd related to his eye complaints, no reasonable jury could conclude she was deliberately indifferent to Dodd's iritis. Summary judgment is thus warranted in favor of Nurse Livers on this claim.

4. **Claims Against Nurse Hutchison**

Dodd is also proceeding against Nurse Hutchison "for deliberate indifference to his serious medical need for treatment for his iritis[.]" ECF 62 at 11. Specifically, Dodd testified at his deposition that Nurse Hutchison was deliberately indifferent to his iritis for two reasons. ECF 98-6 at 10. First, he testified Nurse Hutchison was deliberately indifferent to his iritis because she returned a healthcare request slip to him without providing any treatment. *Id.* Nurse Hutchison argues she responded appropriately to Dodd's healthcare requests. ECF 98 at 30-31.

According to her affidavit, Nurse Hutchison was employed by Wexford as a nurse at WCF. ECF 98-5 at 1. On August 15, 2018, Nurse Hutchison reviewed a healthcare request from Dodd, in which he noted he was having a "chronic care issue" and requested his medication be changed from Mobic back to Naproxen. *Id.* at 2; ECF 98-7 at 48. Nurse Hutchison confirmed that Dodd was enrolled in the chronic care clinic and was scheduled to see his chronic care physician the following month. *Id.* Because Dodd complained only of his chronic conditions and did not complain of any acute abnormality, Nurse Hutchison did not believe he required a physician referral or any additional treatment at that time. *Id.* She informed Dodd he would be able to discuss his

chronic care issues at his upcoming chronic care visit and that he could purchase

Naproxen from the commissary if he desired. *Id.*

On August 27, 2018, Nurse Hutchison received another healthcare request from

Dodd complaining of a "chronic care issue," this time a potential episode of iritis. ECF

98-5 at 2; ECF 98-7 at 47. Dodd again requested that his medications be changed. *Id.*

Nurse Hutchison informed Dodd his chronic care issues would have to be addressed at

his upcoming chronic care appointment. *Id.* She also informed him that, if he wanted to

be evaluated and treated by a nurse at a sick call appointment, he should submit a new

request and one would be scheduled. ECF 98-5 at 2-3; ECF 98-7 at 47. In Nurse

Hutchison's experience, inmates attempt to designate a "chronic care issue" on a

healthcare request form because they want to avoid paying a copay for a sick call

appointment. *Id.* There is no indication in the record whether Dodd submitted a new

request for a sick call appointment.

Nurse Hutchison argues she responded appropriately to both of Dodd's

healthcare requests because he was not complaining of any new injury, he already had a

chronic care visit scheduled, and he could purchase Naproxen through the commissary.

ECF 98 at 30-31. Here, it is undisputed Dodd designated both of his healthcare requests

as raising a "chronic care issue." Nurse Hutchison therefore responded reasonably to

the healthcare requests by confirming Dodd was enrolled in the chronic care program,

confirming he had a chronic care appointment scheduled, and instructing him to submit

a new request for a sick call appointment if he required immediate treatment. Dodd

provides no evidence that Nurse Hutchison's handling of either of these healthcare requests was improper.

In his response to the summary judgment motion, he argues that IDOC's directives indicate health care services should not be denied due to an inability to pay a copay charge. ECF 113 at 5. But there is no evidence that Dodd was unable to pay a copay charge, or that Nurse Hutchison denied him medical services due to his inability to pay a copay charge. The evidence shows only that Nurse Hutchison instructed Dodd to submit a new request for a sick call appointment if he required immediate treatment, and Dodd offers no evidence this response was improper. Based on the evidence in the record, no reasonable jury could conclude Nurse Hutchison's handling of Dodd's healthcare requests was plainly inappropriate.

Second, Dodd testified Nurse Hutchison was deliberately indifferent to his iritis because she provided him prescription eye drops without a physician order. ECF 98-6 at 10. Nurse Hutchison attests that, on September 5, 2018, she saw Dodd regarding his complaints of eye redness, examined him, contacted the medical provider to obtain orders, received confirmation of an order for prescription eye drops, obtained the eye drops from urgent care, and dispensed the eyedrops to Dodd. ECF 98-5 at 3; ECF 98-7 at 20-23. Thus, Nurse Hutchison attests, and the medical records indicate, that a physician gave the order for Dodd to receive the prescription eye drops. Dodd offers no evidence Nurse Hutchison provided medication without a physician order, and his mere speculation is insufficient to create a genuine dispute of material fact. *See Trade Fin. Partners, LLC*, 573 F.3d at 407. Thus, no reasonable jury could conclude Nurse

Hutchison was deliberately indifferent for issuing Dodd prescription eye drops without a physician order.

Accordingly, based on the evidence in the record, no reasonable jury could conclude Nurse Hutchison was deliberately indifferent to Dodd's iritis. Summary judgment is warranted in favor of Nurse Hutchison on this claim.

5. Claims Against Wexford of Indiana

Dodd's final claims are against Wexford, the entity who employs the various healthcare providers discussed above. He brings a claim under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) and for breach of contract. He also requests an injunction.

Regarding Dodd's *Monell* claim, he testified he is suing Wexford because they have a policy of delaying and denying necessary medical care. ECF 98-6 at 11. Under *Monell*, a private company like Wexford may only be held liable for constitutional violations caused by the company through its own policy, practice, or custom. *See Rice v. Corr. Med. Servs.*, 675 F.3d 650, 694 (7th Cir. 2012). To recover under *Monell*, a plaintiff must establish that: (1) he suffered a deprivation of a federal right (2) as a result of an express municipal policy, a widespread custom, or a deliberate act of a decision-maker with final policymaking authority for the municipality that (3) was the proximate cause of his injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). Thus, "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield Ill.*, 630 F.3d 499, 504 (7th Cir. 2010). Here, because each Wexford employee provided Dodd with constitutionally adequate

16

care for his iritis and his pain associated with his ankylosing spondylitis and there is no

evidence they unnecessarily delayed or denied any necessary treatment, as discussed

above, no reasonable jury could conclude Wexford's policies caused Dodd a

constitutional injury. *See id.* Thus, summary judgment is warranted in favor of Wexford

on Dodd's *Monell* claim.

Regarding Dodd's injunctive relief claim against Wexford, he is proceeding against

Wexford "for injunctive relief to require it to stop following a policy of delaying

necessary medical care[.]" ECF 62 at 12. Wexford argues this claim is now moot because

it no longer maintains a contract with IDOC and a new medical care contractor,

Centurion, now provides medical care at IDOC facilities. ECF 98 at 32-33. Dodd testified

at his deposition that he understands Wexford no longer provides medical services at

IDOC facilities. ECF 98-6 at 11. Thus, because it is undisputed Dodd no longer receives

medical services from Wexford and he provides no evidence he will receive medical

services from Wexford in the near future, his injunctive relief claim against Wexford is

moot. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). Summary judgment is thus

warranted in favor of Wexford on Dodd's injunctive relief claim.

Finally, Dodd claims that Wexford breached "its contract with the IDOC." ECF 62

at 12. Specifically, he testified he is suing Wexford because they violated their obligation

to adhere to IDOC's healthcare service directives, which they were required to comply

with via their contract with IDOC. ECF 98-6 at 12. Wexford argues Dodd has no basis to

bring a breach of contract claim because he is not a third-party beneficiary to the

contract between Wexford and IDOC. ECF 98 at 33-34. Specifically, Wexford provides a

copy of its contract with IDOC, which states "[t]he parties do not intend to create in any other individual entity, inmate or patient, the status of third party beneficiary, and this Contract shall not be construed as to create such status." ECF 98-8 at 3.

Under Indiana law, it is well settled that the parties to a contract "are the ones to complain of a breach, and if they are satisfied with the disposition which has been made of it and all claims under it, a third party has no right to insist that it has been broken." *Harold McComb & Son, Inc. v. JPMorgan Chase Bank*, 892 N.E.2d 1255, 1258 (Ind. Ct. App. 2008) (internal quotation omitted). Thus, "only the parties to a contract, those in privity with the parties, and intended third-party beneficiaries under the contract may seek to enforce the contract." *Id*. The Indiana Supreme Court has explained that a third-party to a contract only has a claim if it "clearly appears that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed." *Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006). "[T]he intent to benefit the third party is the controlling factor and may be shown by specifically naming the third party or by other evidence." *Eckman v. Green*, 869 N.E.2d 493, 496 (Ind. Ct. App. 2007).

Here, the contract between IDOC and Wexford cannot be interpreted to create a third-party benefit in Dodd, as the contract explicitly states the contrary. Thus, the undisputed evidence shows Dodd does not have a valid breach-of-contract claim

18

against Wexford. Regardless, Dodd has provided no evidence that Wexford breached its contract with IDOC, as the record shows each Wexford employee provided constitutionally adequate medical care for Dodd's conditions, as discussed above. Summary judgment is thus warranted in favor of Wexford on Dodd's breach-of-contract claim.

ACCORDINGLY, the court:

(1) GRANTS the defendants' summary judgment motion (ECF 97) in its entirety; and

(2) DIRECTS the clerk to enter judgment in favor of the defendants and against Richard Dodd and to close this case.

SO ORDERED on August 25, 2022.

/s/ Philip P. Simon
JUDGE
UNITED STATES DISTRICT COURT